IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ELAINE LIPPINCOTT, et al., | |
| Plaintiffs, | Civil No. 12-7175 (JBS) |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | **OPINION** |
| Defendant. | |

APPEARANCES:

Brian G. Smith, Esq.
Community Health Law Project, Inc.
900 Haddon Ave.
Suite 400
Collingswood, NJ 08108
    Attorney for Plaintiffs Elaine Lippincott and Laurence
    Lippincott

Katrina Marie Lederer, Esq.
Social Security Administration
26 Federal Plaza
New York, NY 10278
    Attorney for Defendant Commissioner of Social Security


**SIMANDLE**, Chief Judge:

## I.    INTRODUCTION

This matter comes before the Court pursuant to 42 U.S.C. §§ 405(g)
and 1383(c) for review of the final decision of the Commissioner of
the Social Security Administration denying original Plaintiff Scott
Lippincott's application for disability insurance benefits under
Title II of the Social Security Act (the "Act") and supplemental
security income under Title XVI of the Act.  Elaine and Laurence
Lippincott were substituted as Plaintiffs in this matter following

their son's death in January 2013 pursuant to a consent order signed on April 10, 2013.[1] [Docket Item 12.]

Plaintiffs challenge the decisions of Administrative Law Judge, Frederick Timm ("the ALJ"), at steps three, four, and five of the required five-step sequential analysis.  Plaintiffs also argue that the ALJ failed to consider counsel's letter brief submitted after the administrative hearing, but before the decision.  While the Court finds substantial evidence in the record to support the ALJ's determination that Lippincott failed to satisfy the requirements of Listing 12.04 in step three, the ALJ's conclusory statement regarding Listings 1.04 and 11.00 is insufficient to allow judicial review. For the reasons discussed below, the Court will vacate the Commissioner's final decision and remand the matter for further proceedings.

## II.  Background

### A.  Procedural Background

Scott Lippincott of Delmont, New Jersey, was 45 years old on February 26, 2008 when he filed his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (R. 281-86.)  Lippincott alleged disability based on herniated discs, fractured vertebrae, and mental disabilities.  (R. at 305.)  His

---

[1] This Opinion uses the term "Plaintiffs" to refer to both the claimant, Scott Lippincott, and his parents, Elaine and Laurence Lippincott.

claims were denied initially on September 25, 2008, and upon reconsideration on February 11, 2009. (R. at 151-68.) Lippincott subsequently requested a hearing on March 17, 2009. (R. at 169-70.) The ALJ held a hearing on March 10, 2011 during which Lippincott appeared in person and was represented by counsel. (R. at 85.) Lippincott and his mother, Elaine Lippincott testified at this first hearing. (R. at 83-132.) The ALJ held a supplemental hearing on April 15, 2011 during which a vocational expert, Patricia Sasona, testified.[2] (R. at 53-82.) The ALJ's decision suggests that Lippincott was present and testified at the supplemental hearing as well, but the transcript states that he was not present and does not contain any such testimony. (R. at 19.) On June 3, 2011, the ALJ found that Lippincott was not disabled and denied his application for Social Security benefits. (R. at 19-29.) The Appeals Council denied Lippincott's request for review on September 14, 2012. (R.

---

[2] Plaintiffs note that the vocational expert appeared by telephone, but acknowledge that the transcript does not explicitly address the manner of her appearance. (Pl. Br. [Docket Item 13] at 13.) Also, the correct spelling of the vocational expert's name remains unclear. The administrative hearing transcript includes two spellings: "Patricia Secerna" and "Patricia Ceserna," while Plaintiffs' briefing and the ALJ decision contains a third. (R. at 19, 61.) The Court adopts the spelling in Plaintiffs' briefing and the ALJ's decision: "Patricia Sasona." (R. at 19.)

at 1-6.) Plaintiffs filed this action, and the parties completed briefing on June 21, 2013.

## B. Medical History

The record in this case is voluminous and contains medical evidence from various sources. Neither Plaintiffs, nor Defendant provide an overview of Lippincott's medical history. The Court notes the relevance of the following medical evidence because it provided the basis for the ALJ's determination.

### 1. Dr. Zechowy

Upon referral by his primary care physician, Dr. William Hingston, Lippincott underwent a neurological evaluation in September 2004 performed by Dr. Allen C. Zechowy. (R. at 554.) At the time, Lippincott reported being assaulted in May 2004 and being struck on the head with a shotgun. (Id.) Since the incident, Lippincott stated that he became very irritable quickly and suffered panic attacks. (Id.) The clinical impression was concussion, post-concussion syndrome, rule/out seizure disorder vs. post-traumatic sleep disturbances, and personality change as a result of head trauma. (R. at 555.) An abnormal EEG from this same period revealed a single slow sharp diffuse paroxysmal discharge compatible with cerebral cortical irritability. (R. at 579.)

### 2. Cooper University Hospital

Records from Cooper University Hospital indicate that Lippincott

reported to the emergency department in May 2006 for a laceration under his right eye after being struck with a gun.  (R. at 524.)  He declined to be evaluated.  (R. at 520.)  Additional records from the Cooper University Hospital document an inpatient stay from December 1, 2008 to December 4, 2008 for acute bronchitis.  (R. at 665-66.) A physical examination showed no spinal tenderness and no neck rigidity.  (R. at 665.)

### 3.  New Jersey Department of Corrections

The record includes treatment notes from the New Jersey Department of Corrections from two periods: 1) April 2005 to February 2008; and 2) August 2010 to February 2011.  These records document treatment for a variety of conditions including insomnia (chronic, secondary to years of substance abuse), mood disorder, personality disorder NOS, polysubstance dependence, seizure disorder, blunt head trauma, hepatitis C, herniated cervical disc, arthritis, back pain, herniated lumbosacral disc, MRSA infection, dermatitis, glucose intolerance, dyslipidemia, smoker, obesity, hyperopia, and presbyopia.  (R. at 414.)

Notes from an office visit on November 23, 2010 indicate that Lippincott reported numbness and tingling in his legs.  (R. at 1990.) He was wheeled into the office in a wheelchair, but had no problem removing his shoes and socks.  (R. at 1991.)  Notes from another

office visit on November 8, 2010 document a normal physical examination with no acute distress.  (R. at 2003-04.)

### 4. Kennedy Health System Behavioral Health Services

Records from Kennedy Health System Behavioral Health Services indicate that Lippincott was evaluated in April 2008 and reported feeling depressed and anxious because he had been off his medications. (R. at 536.)  He also reported being shot in the back of the head in 2004.  (Id.)  He was diagnosed with depression disorder NOS and PTSD based on his reported history.  (R. at 537.)  He was assigned a GAF of 56.  (Id.)

Additional records from Kennedy Behavioral Health indicate that Lippincott attended an intensive outpatient treatment program from June 2008 to August 2008.  (R. at 1860.)  Lippincott was discharged upon completion of the program with diagnoses of major depressive disorder (recurrent), PTSD, rule out cocaine abuse, and a GAF of 50. (R. at 1862.)  Upon discharge, it was recommended that Lippincott follow up with a bipolar/depression support group.  (Id.)

### 5. Steiner Behavioral Health

Lippincott also received treatment at Steiner Behavioral Health from July through September 2009.  (R. at 1937-66.)  A comprehensive intake assessment completed on July 10, 2009 indicates diagnoses of mood disorder NOS and PTSD with a GAF of 50.  (R. at 1950.)  The assessment identified strengths of self-care skills, language skills,

and past work history.  (R. at 1961.)  After failing to follow up with the program, Lippincott was discharged with the same diagnoses.  (R. at 1937.)

### 6.  Dr. Rosenberg

In addition to the behavioral health treatment above, the record contains a psychiatric evaluation from Dr. Leon I. Rosenberg at the Center for Emotional Fitness in Cherry Hill, NJ from April 2008.  (R. at 587-89.)  This evaluation notes that Lippincott was seen on an emergency basis after being released from Southern State Correctional Facility and being without medications.  (R. at 587.)  Lippincott received initial diagnoses of major depressive episode, rule out PTSD, and a GAF of 55.  (R. at 589.)  The record only contains one follow-up note that Lippincott asked to continue his medications.  (R. at 590.)

### 7.  MRIs of Back and Spine

The record contains numerous MRIs of Lippincott's back and spine spanning a period from April 2003 to July 2009.  A MRI of the cervical spine from April 2003 revealed moderately large right sided post lateral disc herniation at C5-C6 with narrowing of the neuroforamen associated with some slight osteophyte.  (R. at 559-60.)  This MRI also revealed some uncinated process hypertrophy with minimal encroachment on the neural foramina on the left side at C5-C6 and bilaterally at C6-7.  (Id.)

A MRI of the cervical spine from July 2005 revealed C5-C6 right-sided bony ridging with an associated right-sided disc protrusion/herniation with flattening of the right side of the spinal cord resulting in mild central canal stenosis. (R. at 1857.) This MRI further revealed mild narrowing of the right neural foramina, mild bulging disc T2-T3, bulging disc and degenerative end plate ridging, C6-C7, and no disc herniation or spinal stenosis. (Id.)

A MRI of the lumbosacral spine from April 2008 revealed L5-S1 right lateral recess disc extrusion impinging the descending right S1 nerve root and mild foraminal narrowing. (R. at 576.) A MRI of the cervical spine from this same period revealed C5-C6 degenerative disc disease with osteophytic ridging and uncovertebral joint hypertrophy resulting in foraminal narrowing and indentation of the ventral thecal sac. (R. at 578.)

 Lippincott received a L5-S1 lumbar epidural steroid injection on September 12, 2008 at the Cooper Surgery Center. (R. at 608-11.)

A cervical MRI from July 2009 resulted in a clinical impression of degenerative disc disease C5-6 with considerable right foraminal stenosis and mild bilateral foraminal stenosis at C6-7.[3] (R. at 1925-26.) A lumbar MRI from this same period resulted in a clinical impression of large right foraminal disc herniation L5-S1 with

---

[3] It is important to note that the ALJ refers to all of the above MRIs in his decision except for these MRIs completed in July 2009. (R. at 27.)

associated findings of degenerative disc disease, resulting in right foraminal stenosis but only minimal central stenosis.  (R. at 1926.)

### 8. State Consultative Exams

Lippincott was examined by state examiner, T.J. Citta-Pietrolungo, on August 20, 2008.  (R. 591-94.)  Lippincott reported chronic neck pain, chronic back pain with pain radiating into the thighs, and a history of traumatic brain injury and rib fractures.  (R. at 591.)  Lippincott's history revealed degenerative disc disease with right S1 disc narrowing and disc protrusion.  (Id.) He suffered a gunshot wound to the head on March 9, 2004 with posttraumatic seizures, which resolved after one year.  (Id.)

The examiner concluded that Lippincott had a history of polysubstance abuse now in remission and a history of gunshot wound to the posterior occiput resulting in diminished coordination and balance.  (R. at 592.)  Lippincott also had a disc herniation right L5-S1 which resulted in radicular symptoms into the right lower extremity.  (Id.)  He also suffered from degenerative disc disease in the cervical and lumbar spine causing chronic pain.  (Id.)  He was limited for over exertional activities, higher level balance and coordination activities.  (Id.)  He required cues and list making for reminders of daily events.  (Id.)

Lippincott underwent a consultative exam in September 2008 with Ronald J. Karpf, Ph.D.  (R. at 595-99.)  He was diagnosed with major

depressive disorder (recurrent, moderate), cognitive disorder NOS, and cannabis dependence (sustained full remission).  (R. at 599.)  An assessment of Lippincott's activities of daily living revealed that Lippincott did some shopping and light cooking himself, but he did not do any cleaning.  (R. at 597.)  He could not handle and budget money himself and could not maintain a residence.  (Id.)  However, he could take public transportation and drive a car.  (Id.)  Personal grooming and hygiene were not problematic.  (Id.)  Lippincott reported problems comprehending and following instructions, but he did not manifest this in the interview.  (Id.)

A state Residual Functional Capacity Assessment, completed September 9, 2008 by Melvin Golish, found that Lippincott could lift at the light exertional level and stand or walk for at least two hours in an eight hour work day.  (R. at 601.)  He was limited in feeling in his right index finger.  (R. at 603.)  He must avoid concentrated exposure to extreme cold, heat, wetness, humidity and hazards.  (R. at 604.)  A state Mental Residual Functional Assessment, completed September 23, 2008 by Jane Curran, found no more than moderate limitations in any area of functioning.  (R. at 626-28.)

A state Psychiatric Review Technique form, completed September 23, 2008 by Jane Curran, also found that Lippincott was no more than moderately limited in any of the areas of functional limitation.  (R. at 612-25.)

### 9. Dr. Hingston

Dr. Hingston was Lippincott's primary care physician before and after his incarceration.  Notes from Dr. Hingston include a CT scan of Lippincott's brain, completed July 29, 2009 by Dr. James H. Jacoby. (R. at 1924.)  This CT scan revealed left parietal craniotomy with findings of encephalomalacia in the left parietal region which apparently is secondary to old gunshot wound.  (Id.)  No other focal areas of altered tissue density or space occupying areas of mass effect were observed.  (Id.)  The basal cisterns and ventricular systems were normal.  (Id.)  The posterior fossa was unremarkable.  (Id.) There was no evidence of midline shift or extra-axial fluid collection.  (Id.)  The clinical impression was left parietal craniotomy defect with underlying area of encephalomalacia.  (Id.)

Also included in records from Dr. Hingston is a medical-vocational assessment for the Camden County Board of Social Services completed on June 30, 2008.  (R. at 1932-36.)  Dr. Hingston completed this assessment form and verified diagnoses of herniation L5-S1, C5-C6, brain abnormality, hepatitis C, and arthritis.  (R. at 1933.)  Dr. Hingston also indicated that Lippincott was ambulatory, but had limitations in standing, walking, climbing, stooping, bending and lifting.  (Id.)  Dr. Hingston opined that Lippincott would be disabled from June 2008 through June 2009.  (R. at 1934.)

## 10. St. Francis Medical Center

Lippincott was admitted to St. Francis Medical Center on August 19, 2010 for right-sided weakness, rule out CVA. (R. at 1968.) Lippincott was seen by a neurologist. (Id.) He had neuro checks done and CT scan which revealed no acute infarction. (Id.) The discharge diagnoses from August 24, 2010 were depression, seizure disorder, history of CVA, and hyperlipidemia. (Id.) A MRI of the brain showed chronic infarction, no acute infarction. (Id.) Where the record addresses Lippincott's seizure disorder, it states "no new episode."[4] (R. at 1969.)

## C. Administrative Law Judge's Findings and Determinations

In his written decision, the ALJ determined that Lippincott was not disabled. (R. at 19.) The decision outlines the required five-step analysis the ALJ followed. In the first step, the ALJ found that Lippincott had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 21.) In the second step, the ALJ found the following severe impairments under 20 C.F.R. 404.1520(c) and 416.920(c): seizure disorder and mild left lower extremity weakness status post gunshot wound, HNPs cervical and lumbar spine, Hepatitis C, cognitive disorder NOS, major depressive disorder, and anti-social behavior disorder. (Id.) Further, the ALJ

---

[4] The ALJ's decision refers to this hospitalization as evidence that "[c]laimant suffered a seizure on August 19, 2010 but reported not being on his medication." (R. at 26.)

12

found a non-severe impairment of polysubstance abuse in full remission. (Id.) In the third step, the ALJ found Lippincott did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926). (R. at 14–15.) Specifically, regarding Lippincott's mental impairments, the ALJ concluded,

> The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied . . . . In activities of daily living, the claimant has moderate restriction . . . . In social functioning, the claimant has moderate difficulties. With regard to concentration, persistence or pace, the claimant had moderate difficulties. As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

> The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

(R. at 22.) Further, regarding Lippincott's physical conditions, the ALJ concluded, "The claimant's back disorder has been considered under listing 1.04 and alleged neurological impairments have been considered under the listings in 11.00 and found not to meet or equal a listing." (Id.)

13

Next, the ALJ evaluated Lippincott's residual functional capacity, or the activity that Lippincott was still capable of performing despite the above impairments. The ALJ determined that Lippincott had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) with the following limitations: he could never climb ladders/ropes/scaffolds, he could perform basic balancing frequently and other postural maneuvers occasionally, he had no feeling in his right index finger, he must avoid concentrated exposure to extreme environments (e.g. heat, cold, humidity, loud noises) and environmental irritants, and he must avoid exposure to hazards (e.g. heights, moving machinery, sharp edges). (R. at 23.) The ALJ also determined that Lippincott was "further limited to simple, routine tasks and to goal-oriented rather than production-paced tasks, with no significant interaction with the general public and no food contact." (Id.)

In step four, the ALJ determined that Lippincott was unable to perform any past relevant work under 20 C.F.R. §§ 404.1565, 416.965 as a route truck driver, glazier, and assistant manager of a liquor store. (R. at 28.) Finally, in step five, based on Lippincott's age, education, work experience, and residual functional capacity, the ALJ determined that Lippincott could perform jobs that exist in

significant numbers in the national economy.  (Id.)  As such, the ALJ determined that Lippincott was not disabled.  (R. at 29.)

## III.  Discussion

### A.  Standard of Review

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g); Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995). The Court's review is deferential to the Commissioner's decision, and the Court must uphold the Commissioner's factual findings where they are supported by "substantial evidence."  42 U.S.C. § 405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Cunningham v. Comm'r of Soc. Sec., No. 11-2633, 2012 WL 6200379, at *2 (3d Cir. Dec. 13, 2012).  Substantial evidence is defined as "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 400 (1971); Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012) (using the same language as Richardson).  Therefore, if the ALJ's findings of fact are supported by substantial evidence, the reviewing court is bound by those findings, whether or not it would have made the same determination. Fargnoli, 247 F.3d at 38.

The ALJ must set out a specific factual basis for each finding. Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974).  "When a conflict in the evidence exists, the ALJ may choose whom to credit

15

but cannot reject evidence for no reason or for the wrong reason. The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citations omitted). While a court should not "expect the ALJ to make reference to every relevant treatment note in a case," Fargnoli, 247 F.3d at 42, "[t]he ALJ's failure to address evidence in direct conflict with his/her findings . . . is erroneous." Landeta v. Comm'r of Soc. Sec., 191 Fed. Appx. 105, 110 (3d Cir. 2006).

**B. Legal Standard for Determination of Disability**

Under the Social Security Act, a "disability" is defined, for the purposes of a plaintiff's entitlement to benefits, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); Plummer, 186 F.3d at 427. A claimant is considered unable to engage in any substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The disability determination involves a five-step sequential process:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity . . . . If a claimant is found to be engaged in substantial activity, the disability claim will be denied . . . .
>
> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment . . . . If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work . . . . If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.
>
> Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work . . . . If the claimant is unable to resume her former occupation, the evaluation moves to the final step.
>
> At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability . . . . The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled . . . .

Plummer, 186 F.3d at 428 (citations omitted).

On appeal, Plaintiffs challenge the ALJ's decisions at steps three, four, and five. Plaintiffs also argue that the ALJ failed to consider Lippincott's counsel's letter brief submitted after the

administrative hearing, but before the decision.  The Court will analyze each issue in turn.

**IV.  Analysis**

Plaintiffs allege that the ALJ made eight errors in determining Lippincott is not disabled: (1) the ALJ improperly evaluated Lippincott's condition under Listing 12.04, (2) the ALJ improperly evaluated Lippincott's condition under Listing 1.04, (3) the ALJ improperly evaluated Lippincott's condition under Listing 11.00, (4) the ALJ improperly allowed the vocational expert to testify by telephone, (5) the ALJ improperly found that the vocational expert was qualified, (6) the vocational expert's testimony was not in accord with the ALJ's hypothetical, (7) the ALJ's evaluation of Lippincott's residual functional capacity is not supported by substantial evidence, and (8) the ALJ failed to consider counsel's letter brief.

For the following reasons, the Court finds that there is substantial evidence in the record to support the ALJ's findings that Lippincott did not meet the listed impairment requirements for Listing 12.04, but that the ALJ failed to adequately explain his determination that Lippincott did not meet the requirements for Listings 1.04 and 11.00.  Therefore, the Court will vacate the Commissioner's decision and remand for further proceedings to determine and explain, based on the evidence in the record and any

additional evidence and testimony, whether Lippincott's impairments
met the Commissioner's requirements for Listing 1.04 and 11.00.

### A. Step Three: Listed Impairments

#### 1. Generally

In *Sullivan v. Zebley,* 493 U.S. 521, 532 (1986), the Supreme
Court explained the implications of a finding of disability at step
three.  The level of severity required to meet or equal a listed
impairment is higher than that needed to meet or equal the statutory
standard for disability.  Id. at 532.  That is, the listings define
impairments which would prevent an adult, regardless of his age,
education, or work experience, from performing not just substantial
gainful activity, but any gainful activity.  Id.; 20 C.F.R. §
416.925(a) (stating that the purpose of the listings is to describe
impairments "severe enough to prevent a person from doing any gainful
activity"); S.S.R. 86-8 (stating that the listings define "medical
conditions which ordinarily prevent an individual from engaging in
any gainful activity").  Hence, the listings operate as a
presumption of disability.  *Zebley,* 493 U.S. at 532.  If an adult
is not working and possesses an impairment which matches or equals
a listed impairment, that individual is conclusively presumed to be
disabled and awarded benefits without further inquiry.  Bowen v.
Yuckert, 482 U.S. 137, 141 (1987); Petition of Sullivan, 904 F.2d
826, 845 (3d Cir. 1990) (holding that a finding of disability at step

three implicitly includes a finding that the symptoms of the disease have progressed to a degree that objectively precludes any gainful work).  However, if the impairment is not one that is conclusively presumed to be disabling, then the evaluation proceeds to the fourth step.  Yuckert, 482 U.S. at 141; Bowen v. City of New York, 476 U.S. 467, 471 (1986) (stating "[i]f a person claimant's condition meets or equals the listed impairments, he is conclusively presumed to be disabled and entitled to benefits"; if not, "the process moves to the fourth step").

The listings are set at a very high level of severity, so that anyone so impaired is presumed disabled.  Zebley, 493 U.S. at 521. An adult claimant must present evidence that an unlisted impairment, or combination of impairments, equals the severity of all the criteria for a listed impairment to establish equivalence.  Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992).  The ALJ must adequately explain findings on equivalence.  Marcia v. Sullivan, 900 F.2d 172 (9th Cir. 1990).

At step three, the burden is on the plaintiff to prove that his impairment equals one listed in Appendix 1.  Bowen, 482 U.S at 146; Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 120 (3d Cir. 2000).  The plaintiff must put forth more than just subjective complaints of pain because subjective complaints "do not in themselves constitute disability," Green v. Schweiker, 749 F.2d

1066, 1070 (3d Cir. 1984), unless accompanied by medical signs and laboratory findings which show that the claimant has a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged. _Bittel v. Richardson_, 441 F.2d 11983, 1195 (3d Cir. 1971). Nonetheless, the ALJ should give serious consideration to the claimant's subjective complaints of pain, _Welch v. Heckler_, 808 F.2d 264, 270 (3d Cir. 1986), evaluating the claims of pain and the severity of that pain, in light of the plaintiff's credibility and the medical findings. 20 C.F.R. § 404.1529(c)(1); _Brown v. Schweiker_, 562 F.Supp. 284, 287 (E.D. Pa. 1983) (quoting _Bolton v. Secretary of HHS_, 504 F.Supp. 288 (E.D.N.Y. 1980)).

Although it is the plaintiff's burden to present evidence that the impairment meets the listed requirements, the ALJ still has the duty to support his determinations by discussing the evidence. _Burnett_, 220 F.3d at 120. The ALJ cannot state summarily that an impairment does not meet the listing, and it is error to not discuss the evidence or reasons at step three. _Id.; Clifton v. Chater_, 79 F.3d 1007, 1010 (10th Cir. 1996). The ALJ need not "use particular language or adhere to a particular format in conducting his analysis," but the ALJ must provide "sufficient development of the record and explanation of findings to permit meaningful review." _Jones v. Barnhart_, 364 F.3d 501, 505 (3d Cir. 2004); _Diaz v. Comm'r of Soc. Sec._, 577 F.3d 500, 504 (3d Cir. 2009).

## 2. As Applied to Mr. Lippincott

The ALJ determined that Lippincott suffered from the following severe impairments under 20 C.F.R. 404.1520(c) and 416.920(c): seizure disorder and mild left lower extremity weakness status post gunshot wound, HNPs cervical and lumbar spine, Hepatitis C, cognitive disorder NOS, major depressive disorder, and anti-social behavior disorder. (R. at 21.) However, the ALJ found that Lippincott lacked an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926). (Id.)

The ALJ's decision addresses Lippincott's mental impairments under Listing 12.04, back condition under listing 1.04, and neurological impairments under Listing 11.00. (R. at 22.) The ALJ's decision discusses Lippincott's mental impairments under each subpart of Listing 12.04. After noting the "paragraph B" criteria under Listing 12.04, the ALJ's discussion consists of the following paragraphs:

> In activities of daily living, the claimant has moderate restriction. During a consultative examination the claimant reported doing some shopping himself, he does light cooking but does not do any cleaning. He cannot handle and budget money himself. He cannot maintain a residence by himself. He can take public transportation and also drives a car. Personal grooming and hygiene were non-problematic. The patient reports he has problems comprehending and following instructions but he could not manifest any of this in the interview. In the interview,

he could focus on the topic of conversation (Exhibit 7F, page 3).

In social functioning, the claimant has moderate difficulties (Exhibits 10F and 11F).

With regard to concentration, persistence or pace, the claimant has moderate difficulties (Exhibits 10F and 11F).

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

(Id.)

The ALJ's discussion regarding Lippincott's back and neurological impairments is less comprehensive and consists of a single conclusory sentence: "The claimant's back disorder has been considered under listing 1.04 and alleged neurological impairments have been considered under the listings in 11.00 and found not to meet or equal a listing." (Id.)

The Court must consider whether substantial evidence in the record supports the ALJ's findings.

### 3. Listing 12.04

Listing 12.04 provides the listing criteria for affective disorders. A claimant will meet the listing only when the

requirements of both "paragraph A" and "paragraph B" are satisfied, or when the requirements in "paragraph C" are satisfied. 20 C.F.R. § 404, Subpt. P, App. 1, Sec. 12.04. A claimant will satisfy the paragraph A criteria through medically documented persistence of depressive syndrome, manic syndrome, or bipolar syndrome, each of which is characterized by its own list of symptoms. 20 C.F.R. § 404, Subpt. P, App. 1, Sec. 12.04A. To satisfy the paragraph B criteria, a claimant's mental impairments must result in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. § 404, Subpt. P, App. 1, Sec. 12.04B. Activities of daily living include "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. § 404, Subpt. P, App. 1, Sec. 12.00C(1). Analysis of a claimant's activities of daily living involves an assessment of the "quality of these activities by their independence, appropriateness, effectiveness, and sustainability," and the extent to which a claimant is "capable of

initiating and participating in activities independent of supervision or direction." Id.

The regulations accompanying Listing 12.00 for mental disorders explain that the criteria in paragraphs B and C describe impairment-related functional limitations that would prevent any gainful activity. 20 C.F.R. § 404, Subpt. P, App. 1, Sec. 12.00. The regulations define "marked" as "more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." Id. The regulations further define "marked" in the context of activities of daily living:

> We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

Id.

Paragraph C requires a medically documented history of a chronic affective disorder of at least two years' duration, as well as, one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404, Subpt. P, App. 1, Sec. 12.04C.

Plaintiffs argue that the ALJ improperly evaluated Lippincott's condition under Listing 12.04. (Pl. Br. at 7.) Plaintiffs note that it appears the ALJ determined that Lippincott's condition satisfied the paragraph A criteria because the ALJ, at step two, made a formal finding that Lippincott suffered from a major depressive disorder and did not discuss the requirements of paragraph A under Listing 12.04. (Id.) Plaintiffs therefore emphasize that the ALJ improperly evaluated Lippincott's condition under paragraph B of the listing. (Id. at 8.) Plaintiffs reject the ALJ's analysis of Lippincott's daily functioning under the first criteria of paragraph B: marked restriction of activities of daily living. (Id.) Plaintiffs argue that the ALJ erred in relying solely on Lippincott's statements during a state psychological consultative examination that he could do some shopping, light cooking, grooming, and hygiene, but he could not handle money and maintain a residence. Plaintiffs further argue that the ALJ failed to consider the testimony of Lippincott's mother verifying that he lived in a trailer on her

property, and at times experienced substantial limitations in functioning.  (Id. at 8-9.)

Moreover, Plaintiffs argue that the ALJ's analysis of Lippincott's social functioning under the second criteria of paragraph B was "even more cursory" because the ALJ only cites to two exhibits completed by a non-treating, non-examining medical consultant on September 23, 2008: a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment.  (Id. at 10.) Plaintiffs note that the ALJ simply adopted the conclusions from the Psychiatric Review Technique Form even though the form provides no explanation for the bases of those conclusions.  (Id.)  Plaintiffs also argue that these forms were completed two years before the ALJ's decision and Lippincott subsequently suffered a stroke in August 2010, in addition to his seizure disorder and cognitive disorder. (Id.)

Substantial evidence in the record supports the ALJ's determination that Lippincott had only a moderate restriction in activities of daily living under paragraph B of Listing 12.04.  The ALJ cites to a state psychological consultative examination dated September 8, 2009.  (R. at 595-99.)  The ALJ appears to rely exclusively on a quotation from the examination report:

> During a consultative examination the claimant reported doing some shopping himself, he does light cooking but does not do any cleaning.  He cannot handle and budget money himself.  He

27

cannot maintain a residence by himself.  He can take public
transportation and also drives a car.  Personal grooming and
hygiene were non-problematic.  The patient reports he has
problems comprehending and following instructions but he could
not manifest any of this in the interview.  In the interview,
he could focus on the topic of conversation.

(R. at 22.)  This report suggests that Lippincott could perform

certain activities of daily living such as shopping, cooking,

driving, and personal grooming and hygiene.  It also discusses

limitations such as an inability to manage money and maintain a

residence by himself.  While the ALJ provides no explanation for why

these statements support a finding of only "moderate," as opposed

to "marked," restrictions in activities of daily living, the

regulations are clear that a "marked" restriction is not determined

by "a specific number of different activities of daily living in which

functioning is impaired, but by the nature and overall degree of

interference with function."  20 C.F.R. § 404, Subpt. P, App. 1, Sec.

12.00.  The consultative examination supports a finding that Mr.

Lippincott's limitations did not severely restrict his overall

function.  Further, Plaintiff fails to identify evidence in the

record to contradict the ALJ's determination.  Plaintiff refers only

to the testimony of Lippincott's mother who testified at the

administrative hearing that Lippincott's mental capacity was

sporadic, at times causing no problems, at other times causing

substantial limitations.  (R. at 124, 127.)  This testimony makes

no reference to activities of daily living.  As such, the Court finds that substantial evidence supports the ALJ's determination.

Similarly, substantial evidence in the record supports the ALJ's determination that Lippincott had only moderate difficulties in social functioning and with regard to concentration, persistence or pace.  For each of these paragraph B criteria, the ALJ supports his conclusion with reference to two exhibits: a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment. (R. at 22.)  Both were completed by a non-treating psychologist, Jane Curran, on September 23, 2008, and both fully support the ALJ's determination.  (R. at 622, 627.)  Moreover, Plaintiffs again fail to identify countervailing evidence in the record.  Plaintiffs note that the forms relied upon by the ALJ were created over two years before the ALJ's decision, and Lippincott suffered a stroke in the interim in August 2010.  (Pl. Br. at 10; R. at 1968.)  The portion of the record cited by Plaintiff as evidence that Lippincott suffered a stroke states, "The patient was admitted to the hospital for right-sided weakness, rule out CVA . . . The patient had an MRI of the brain which showed chronic infarction, no acute infarction." (R. at 1968).  The ALJ referred to this event in his discussion of Lippincott's residual functional capacity and only found it to be evidence of a seizure when Lippincott was off his medications.  (R. at 26.)  While it is beyond this Court's expertise to parse the

meaning of this document, it is at least clear that this document does not discuss any impairments Lippincott experienced following his hospitalization in August 2010.  As such, there are no grounds to find that the ALJ's decision is not supported by substantial evidence.

Further, Plaintiffs fail to identify any other evidence in the record indicating the impact of Lippincott's neurological conditions on his social functioning or concentration, persistence, or pace. Plaintiffs argue that Lippincott suffered from a seizure disorder and a cognitive disorder and state, "It would be surprising if a person's mental functions did not deteriorate in over two years with those conditions." (Pl. Br. at 10.)  The Court is unpersuaded by this argument because Plaintiffs fail to provide any citation to the record for support.  Plaintiffs maintain the burden at step three, and it is clear Plaintiffs have not satisfied this burden with respect to Listing 12.04.  Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007) (citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004)).

Plaintiffs do not challenge the ALJ's decision that Lippincott failed to satisfy the final criteria of paragraph B regarding episodes of decompensation or any criteria of paragraph C. Accordingly, the Court finds substantial evidence in the record to

support the ALJ's determination that Lippincott's impairments did not satisfy the criteria for Listing 12.04.

### 4. Listings 1.04 and 11.00

Listing 1.04 provides the criteria for disorders of the spine resulting in compromise of a nerve root or the spinal cord. 20 C.F.R. § 404, Subpt. P, App. 1, Sec. 1.04. The claimant must show:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
> or
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Id. Listing 11.00 provides the criteria for neurological disorders, including convulsive epilepsy (11.02), nonconvulsive epilepsy (11.03), and central nervous system vascular accident (11.04). 20 C.F.R. § 404, Subpt. P, App. 1, Sec. 11.00.

The ALJ's decision contains a single sentence regarding these listings: "The claimant's back disorder has been considered under listing 1.04 and alleged neurological impairments have been

31

considered under the listings in 11.00 and found not to meet or equal a listing." (R. at 22.)

Plaintiffs argue that the ALJ improperly evaluated Lippincott's condition under Listings 1.04 and 11.00. Regarding Listing 1.04, Plaintiffs note that the ALJ, at step two, made a formal finding that Lippincott had a severe impairment of "HNP's cervical and lumbar spine." (Pl. Br. at 11; R. at 21.) Plaintiffs also refer to numerous MRIs in the record showing "compromise of a nerve root." (Pl. Br. at 11-12.) Plaintiffs further note the testimony of Lippincott's mother discussing his problems standing, walking, climbing stairs, falling, and needing to lie down. (Pl. Br. at 11.) Regarding Listing 11.00, Plaintiffs note that the ALJ, at step two, determined that Lippincott had a seizure disorder, mild left leg weakness, and a cognitive disorder. (Id. at 13.) Plaintiffs also note that Lippincott suffered from "a CVA or cerbrovascular [sic] accident, also known as stroke, in August of 2010," and concludes, "[a]ll of these conditions are neurological disorders." (Id.)

Regardless of whether these conditions would satisfy the criteria for Listings 1.04 and 11.00, the ALJ's conclusory statement does not allow meaningful review. See Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004); see also Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009). The Court recognizes that the ALJ need not use particular language, but at minimum, the ALJ's decision must

include "sufficient development of the record and explanation of findings." Jones, 364 F.3d at 505. In light of the many types of spinal and neurological symptoms and diagnoses in the record, the ALJ's single conclusory sentence with respect to Listings 1.04 and 11.00 fails to meet this standard and requires remand for explanation of the ALJ's determination that Lippincott's impairments do not meet or equal Listings 1.04 or 11.00.

It is recognized that, having decided to remand the case at step three, the Court has no obligation to reach Plaintiffs' other arguments at steps four and five. Vivaritas v. Comm'r of Soc. Sec., 264 F. App'x 155, 156-57 (3d Cir. 2008) ("Inasmuch as further development of the record and the ALJ's decision based on that record may make consideration of steps four and five of the five-step sequential evaluation procedure unnecessary, we do not reach [plaintiff's] other challenges to the ALJ's decision."). Nonetheless, as counsel have fully briefed the remaining issues and the Court has also considered them, we will address them for the sake of completeness and to avoid the prospect of serial remands. Also, in the event that a second rationale for remand were found now, it could be addressed by the ALJ in the course of this remand.

**B. Step Four: Residual Functional Capacity**

At step four, the ALJ considers the claimant's residual functional capacity and past relevant work. 20 C.F.R. § 404.1520.

If the claimant can still perform past relevant work, the claimant is not deemed disabled.  Id.  If the ALJ finds that the claimant cannot perform past relevant work or the clamant does not have past relevant work, the ALJ uses the claimant's residual functional capacity at step five to decide if the claimant can perform other work in the national economy.  20 C.F.R. § 404.1545(a)(5)(ii).  The residual functional capacity assessment considers how limitations regarding claimant's physical abilities, mental abilities, and any other abilities affected by his impairments may affect the claimant's ability to do work on a regular and continuing basis.  20 C.F.R. § 404.1545(b)-(d).

The ALJ must consider all relevant medical and other evidence when determining an individual's residual functional capacity and must consider limitations imposed by all of an individual's impairments, even those that are not "severe."  20 C.F.R. § 404.1545(a)(2)-(3).  Such evidence includes medical records, lay evidence, effects of symptoms, including pain that are reasonably attributed to a medically determinable impairment, descriptions and observations of limitations by the claimant and others.  20 C.F.R. § 404.1545(a)(3).  Additionally, the ALJ's findings of residual functional capacity must "be accompanied by a clear and satisfactory explanation of the basis on which it rests."  Fargnoli v. Massanari,

247 F.3d 34, 41 (3d Cir. 2001) (quoting <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)).

The ALJ determined that Lippincott had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a).  (R. at 23.)  The ALJ recognized the following limitations:

> [Lippincott] can never climb ladders/ropes/scaffolds, can frequently perform basic balancing and other postural maneuvers occasionally, has no feeling in the right index finger, must avoid concentrated exposure to extreme heat, extreme cold, wetness, humidity, loud noises (4/5 and 5/5) and environmental irritants, must avoid all exposure to hazards (heights, moving machinery & sharp edges); and is further limited to simple, routine tasks and to goal-oriented rather than production-paced tasks, with no significant interaction with the general public and no food contact.

(<u>Id.</u>)  The ALJ explained that this determination followed a careful consideration of the entire record, and referred to extensive medical records including examining physicians and state consultative examinations, as well as testimony from Lippincott and his mother. (R. at 23-28.)  The state Residual Functional Capacity Assessment was completed in September 9, 2008 and concluded that Lippincott could frequently lift or carry 10 pounds and stand or walk for at least two hours in an eight hour work day.  (R. at 601.)  The assessment further concluded that Lippincott had limited feeling in his right index finger and must avoid exposure to extreme cold, heat, wetness, humidity, and hazards.  (R. at 603-04.)  The ALJ also

relied on a Mental Residual Functional Capacity Assessment completed on September 23, 2008, which found "no more than moderate limitations in any area of functioning." (R. at 25; R. at 626-29.) The ALJ stated that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," but the ALJ did not find Lippincott's statements concerning the intensity, persistence and limiting effects of these symptoms to be credible "to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 26.)

Plaintiffs argue that the ALJ's evaluation of Lippincott's residual functional capacity is not supported by substantial evidence. (Pl. Br. at 20.) Plaintiffs refer only to Lippincott's back problems as indicated by MRIs in the record, as well as Elaine Lippincott's testimony that her son had to lie down on a daily basis due to back pain. (Pl. Br. at 20.) Plaintiffs conclude, "There is no medical evidence that shows that Mr. Lippincott would be able to go through a full work day in a seated position without any ability to stand or lie down as needed. The evidence shows that he cannot do that." (Id.) With the exception of the MRIs noted above and the testimony of Lippincott's mother, Plaintiffs provide no citation to the record to support the argument that the ALJ's residual functional capacity assessment is not supported by substantial evidence.

The ALJ's decision references all of the MRIs identified by Plaintiffs with one exception.[5]  While the ALJ "must consider all relevant evidence when determining an individual's residual functional capacity," the ALJ is "not expect[ed] to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records."  Fargnoli v. Massanari, 247 F.3d 34, 41-42 (3d Cir. 2001).  The ALJ's decision states that it is based on "careful consideration of the entire record" and provides extensive factual foundations for the findings.  The ALJ's decision is "sufficient to evaluate whether substantial evidence supports the ALJ's determination."  Sharp v. Astrue, 228 F. App'x 228, 230 (3d Cir. 2007).  Further, the MRI not referenced by the ALJ contains similar findings as the MRIs considered by the ALJ.  As such, the Court finds no reversible error in failing to discuss a single MRI of Lippincott's back.

Moreover, the ALJ did not err in rejecting the testimony of Lippincott's mother.  Lippincott's mother testified at the administrative hearing on March 10, 2011.  (R. at 83-132.)  She testified that Lippincott had to lie down every day due to his physical condition.  (R. at 122-23.)  She also testified that sometimes she observed Lippincott fall and she believed this was

---

[5] The ALJ's decision does not reference MRIs of Lippincott's back and spine completed in July 2009.  (R. at 1925-26.)

because of his back.  (R. at 120.)  As the ALJ notes, Elaine

Lippincott also stated that Lippincott had "a lot of nerve damage."

(Id.)  The ALJ determined that Elaine Lippincott's testimony was not

supported by the medical evidence in the record and stated,

"Additionally, the claimant's mother is not an acceptable medical

source and her opinion as to the claimant's falling down due to back

problems rather than other possible causes is accorded no weight."

(R. at 27.)

The ALJ may use evidence from "other sources," to "show the

severity of the individual's impairment(s) and how it affects the

individual's ability to function."  SSR 06-03p, 2006 WL 2329939, at

*3 (Aug. 9, 2006).  The adjudicator "should explain the weight given

to opinions from these 'other sources,' or otherwise ensure that the

discussion of the evidence in the determination or decision allows

a claimant or subsequent reviewer to follow the adjudicator's

reasoning, when such opinions may have an effect on the outcome of

the case."  Id. at *6.  Here, Elaine Lippincott would qualify as an

"other source," meaning a non-medical source whose relationship with

the plaintiff is not based on a "professional" relationship.  Id.

at *2 (defining "medical source" and "other sources").  The ALJ noted

that Lippincott's mother was not an acceptable medical source and

declined to afford her opinion any weight as to the cause of

Lippincott's falling down.  (R. at 27.)  The ALJ did not state that

he disregarded her testimony altogether.  Instead, it is clear that the ALJ based his decision regarding Lippincott's residual functional capacity primarily on the medical exhibits, which he found to be more credible and persuasive than other testimony.  Therefore, the Court finds that the ALJ's decision regarding Lippincott's residual functioning capacity is adequately explained and supported by substantial evidence.

### C.  Vocational Expert Testimony

If the Commissioner determines that the claimant is unable to perform past relevant work under step four, the analysis proceeds to step five.  In step five, the Commissioner considers the claimant's ability to perform work (residual functional capacity), age, education and past work experience to determine whether or not the claimant is capable of performing other work which exists in significant numbers in the national economy.  See 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c)(1).  In this final step of the sequential analysis, the burden of proving that work is available for the claimant shifts to the Commissioner to prove that there is some other kind of substantial gainful employment that the claimant is able to perform.  Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Depending on the ALJ's interpretation of the available evidence, the ALJ may either rely on the present record for this finding or collect additional information.  The ALJ must, however,

conduct his inquiry using the proper legal standards as enumerated in 20 C.F.R. § 404.1501–1599.

A vocational expert may be used when "the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used." 20 C.F.R. § 404.1566(e). The ALJ is not required to use a vocational expert, but has discretionary power to do so. Id. At step five, the ALJ need only rely on "competent evidence," not necessarily the opinion of a vocational expert, in determining whether the claimant can perform sedentary work. Gilliand v. Heckler, 786 F.2d 178, 183 (3d Cir. 1986).

Here, Plaintiffs challenge the testimony of vocational expert, Patricia Sasona, on three grounds. First, Plaintiffs argue that the ALJ improperly allowed Sasona to testify by telephone. Second, Plaintiffs argue that the ALJ improperly found Sasona qualified. Third, Plaintiffs argue that Sasona's testimony was not in accord with the ALJ's hypothetical.

## 1. Any Error in Allowing Sasona's Testimony by Telephone Was Harmless

Plaintiffs argue that the ALJ improperly allowed the vocational expert to testify by telephone because no statutory or regulatory provision allows testimony by telephone by the claimant or any other witness, and neither Lippincott, nor his attorney received notice

that Sasona would testify by telephone.[6]  (Pl. Br. at 14.)

Plaintiffs rely primarily on two cased from the District of

Connecticut, <u>Koutrakos v. Astrue</u>, 3:11 CV 306 CSH, 2012 WL 1283427

(D. Conn. Jan. 9, 2012), and <u>Edwards v. Astrue</u>, 3:10CV1017 MRK, 2011

WL 3490024 (D. Conn. Aug. 10, 2011), to argue that remand is required

because telephonic testimony of a vocational expert is not addressed

in the applicable statutes and regulations.

Defendant argues that nothing in the regulations prohibits

telephone testimony and the Social Security Administration's

Hearings, Appeals, and Litigation Law Manual (HALLEX) permits ALJs

to obtain expert medical or vocational testimony through in person

testimony, video teleconference, or telephone at a hearing.

Defendant also notes that Lippincott's counsel failed to object at

the hearing to the substance or manner of Ms. Sasona's testimony and

has not shown how Lippincott was prejudiced.

The regulations in effect at the time of Lippincott's hearing

do not address testimony by telephone.[7]  The regulations state that

---

[6] Plaintiff notes that the hearing transcript does not state that
Sasona appeared by telephone, but the portion of the transcript
preceding her testimony only makes sense if she appeared by telephone.
(Pl. Br. at 13.)  Defendant does not contest that Sasona appeared by
telephone and only addresses Plaintiffs' arguments that telephonic
testimony is not permitted by statute or regulation.

[7] New regulations effective June 20, 2013 specifically allow
telephonic testimony: "Witnesses may appear at a hearing in person
or, when the conditions in § 416.1436(c)(2) exist, by video
teleconferencing or telephone."  20 C.F.R. § 416.1450(e).

witnesses may appear at the hearing in person or by video teleconferencing. 20 C.F.R. § 416.1450(e); 20 C.F.R. § 404.936(c) ("The administrative law judge will determine that the appearance of a person be conducted by video teleconferencing if . . . use of video teleconferencing to conduct the appearance would be more efficient than conducting the appearance in person, and . . . no circumstance in the particular case that prevents the use of video teleconferencing to conduct the appearance."). The regulations regarding notice provide in relevant part:

> If we have scheduled you to appear at the hearing by video teleconferencing, the notice of hearing will tell you that the scheduled place for the hearing is a teleconferencing site and explain what it means to appear at your hearing by video teleconferencing. The notice will also tell you how you may let us know if you do not want to appear in this way and want, instead, to have your hearing at a time and place where you may appear in person before the ALJ.

20 C.F.R. § 416.1438(b); 20 C.F.R. § 404.938(b).

The Social Security Administration's Hearings, Appeals, and Litigation Law Manual (HALLEX) permits in person testimony, as well as testimony by telephone and video teleconference. The HALLEX states, "The preferred method for obtaining [medical expert] or [vocational expert] opinion is through in-person testimony or testimony taken via telephone or video teleconference at a hearing."[8]

---

[8] "HALLEX provisions . . . lack the force of law and create no judicially-enforceable rights." Bordes v. Comm'r of Soc. Sec., 235 F. App'x 853, 859 (3d Cir. 2007); see also Schweiker v. Hansen, 450

I-2-5-30. Med. or Vocational Expert Opinion - Gen., HALLEX I-2-5-30 (S.S.A. Sept. 28, 2005).

Only one court in the Third Circuit has addressed whether telephonic testimony of a vocational expert is improper under the regulations. The court in Bates v. Astrue, CIVA 07-074 JJF, 2008 WL 1736819 (D. Del. Apr. 11, 2008), rejected plaintiff's contention that her due process rights were violated when the ALJ allowed the vocational expert to testify by telephone. The Bates court concluded that the plaintiff failed to establish that she was prejudiced by deficiencies in the hearing where plaintiff's counsel failed to object to the vocational expert's testimony by telephone, plaintiff's counsel had an opportunity to cross-examine the expert, and relevant portions of the transcript were intact despite moments when the parties were unable to hear the expert's answers. Id. at *13.

Other courts outside the Third Circuit have addressed telephonic testimony by a vocational expert and found harmless error. See Palaschak v. Astrue, 08-CV-1172 (GLS), 2009 WL 6315324 (N.D.N.Y.

---

U.S. 785, 789 (1981) ("[T]he Claims Manual is not a regulation. It has no legal force, and it does not bind the SSA. Rather, it is a 13-volume handbook for internal use by thousands of SSA employees."); Moore v. Apfel, 216 F.3d 864, 868 (9th Cir. 2000) ("HALLEX is strictly an internal guidance tool, providing policy and other procedural guidelines to ALJs and other staff members. As such, it does not . . . carry the force and effect of law.").

Nov. 18, 2009) (finding harmless error); <u>Cheatham v. Comm'r of Soc.</u>
<u>Sec.</u>, CIV.A. 12-11428, 2013 WL 1843400, at *11 (E.D. Mich. Mar. 19,
2013) ("[I]f the Court adopts a harmless error analysis, this matter
will not require remand.  However, the undersigned is recommending
that this matter be remanded on other grounds.  Therefore, it is the
undersigned's recommendation that the Commissioner be made aware
that its failure to provide notice of the VE's telephone testimony
may have violated 20 C.F.R. § 404.938(b)."); <u>Green v. Astrue</u>, CIV.A.
11-11711-PBS, 2013 WL 636962, at *11 (D. Mass. Feb. 20, 2013) (finding
that the lack of notice of the vocational expert's appearance via
telephone provides no basis for reversal where plaintiff failed to
show prejudice).

Plaintiffs rely on case law finding reversible error where the
ALJ allowed vocational expert testimony by telephone, specifically
<u>Koutrakos v. Astrue</u>, 3:11 CV 306 CSH, 2012 WL 1283427 (D. Conn. Jan.
9, 2012), and <u>Edwards v. Astrue</u>, 3:10CV1017 MRK, 2011 WL 3490024 (D.
Conn. Aug. 10, 2011).  <u>See also</u> <u>Decker v. Comm'r of Soc. Sec.</u>,
2:12-CV-0454, 2013 WL 1363752, at *10 (S.D. Ohio Apr. 3, 2013)
(finding violation of the regulation is not harmless and remanding
to ensure "the claimant is afforded his or her regulatory rights and
that the Commissioner has an appropriate incentive to follow the
regulation in question.").

While courts outside the Third Circuit are divided, this Court need not determine whether the ALJ failed to follow the regulations by allowing vocational expert testimony by telephone because the Court finds that any error was harmless. First, Lippincott's counsel failed to object to the manner or substance of the vocational expert's testimony at the hearing.[9] Second, Lippincott's counsel was able to effectively and extensively cross-examine the vocational expert. Third, there are no gaps in the transcript suggesting any technical difficulties preventing an accurate and complete understanding of the vocational expert's testimony. Finally, Plaintiffs fail to allege or identify any prejudice to Lippincott.[10] As such, even if the ALJ erred, this error would be harmless. Shinseki v. Sanders, 556 U.S. at 409-10 (discussing harmless error in the context of administrative review); Rutherford v. Barnhart, 399 F.3d 546, 533 (3d Cir. 2008) ("[R]emand is not required here because it would not affect the outcome of the case.").

---

[9] The Court recognizes Plaintiffs' argument that without notice of the testimony by telephone, counsel was not prepared to object. (Pl. Reply at 9.) However, the Court finds no error for reasons beyond counsel's failure to object.

[10] The Court rejects Plaintiffs' argument that "when a procedure is not authorized by statute or regulation that an objection should be accepted on appeal and without a showing of prejudice." (Pl. Reply at 8.) The governing regulations at the time of the hearing permitted remote testimony through videoconference, and the present regulations extend this to telephonic testimony in many circumstances. Testimony by telephone was not so far astray from the expected procedure that it could be deemed structural error requiring automatic remand, considering the other factors discussed in the text.

### 2. The ALJ Did Not Err in Finding Sasona Qualified as a Vocational Expert

Plaintiffs argue that the ALJ improperly found Sasona qualified as a vocational expert. Plaintiffs contend that there are no statutes, regulations, or administrative guidance identifying the qualifications for vocational experts in the adjudication of Social Security disability claims. (Pl. Br. at 18.) Further, Plaintiffs argue that Sasona is not a practicing vocational counselor because she has placed only ten people in the last five years.[11] (Id. at 18.)

Defendant responds that Sasona is qualified to serve as a vocational expert due to her educational and professional experience. Defendant further argues that Sasona's experience placing individuals in certain positions is irrelevant to her testimony regarding jobs existing in the national economy within the requirements of step five. (Gov't Opp. at 17.) However, Defendant does not cite to any authority providing qualifications for vocational experts.

Plaintiffs correctly note that the applicable statutory and regulatory provisions do not contain required qualifications for

---

[11] The Court rejects as inapposite Plaintiffs' reliance on Elcock v. Kmart Corp., 233 F.3d 734, 744 (3d Cir. 2000) for the proposition that Sasona's experience as a witness in Social Security proceedings does not qualify her as a vocational expert. (Pl. Br. at 19.) As Defendant notes, Elcock concerned the qualifications of expert witnesses in a premises liability matter. (Gov't Opp. at 18.)

vocational experts.  The HALLEX directs the ALJ to select a
vocational expert from a roster maintained by each regional office.
I-2-5-52. Selecting a Vocational Expert, HALLEX I-2-5-52 (S.S.A.
Sept. 28, 2005).  The vocational experts on the roster have agreed
to provide impartial expert opinion testimony.  Id.  When no listed
vocational expert is available, the ALJ may use a vocational expert
who is not on the roster.  Id.  However, the HALLEX does not provide
a criteria for selecting vocational experts.

Plaintiffs also refer to the Office of Hearing and Appeal's
Vocational Expert Handbook for the Philadelphia Region.  The
Handbook provides the following criteria for selection of a
vocational expert:

> A VE must have up-to-date knowledge of, and experience with,
> industrial and occupational trends and local labor market
> conditions; the ability to evaluate age, education and prior
> work experience in light of the residual functional capacity;
> current and extensive experience in counseling and job
> placement of adult handicapped people; and knowledge of and
> experience using vocational reference sources, including the
> Dictionary of Occupational Titles (DOT), together with any
> supplements, including Selected Characteristics of
> Occupations. The VE should have experience in the use of
> reference sources in developing information about the duties,
> skills, physical demands and working conditions of jobs,
> occupationally significant characteristics of jobs; and
> transferability of skills.

Vocational Expert Handbook, Office of Hearing and Appeals,
Philadelphia Region, SSA, available at
http://www.rehabpro.org/sections/ss-ve/resources/vehandbook.

In this case, Sasona testified that she has a Master's degree in Vocational Rehabilitation Counseling and has practiced her profession for the last 35 years. (R. at 59.) Sasona explained that she is licensed to practice vocational rehabilitation counseling in New Jersey and is certified as a rehabilitation counselor from the Commission of Rehabilitation Counselor Certification. (R. at 59.) Sasona stated that she currently performs vocational rehabilitation services for insurance companies and provides testimony in Social Security hearings. (Id.) Prior to her current employment, Sasona testified that she worked for a dozen years developing vocational plans and placing disabled individuals in appropriate employment. (Id.) Lippincott's counsel objected to Sasona's qualifications on the grounds that she is not an active practitioner because Sasona stated she placed roughly ten individuals over the past five years. (R. at 60.) The ALJ overruled counsel's objection and found Sasona to be qualified. (Id.)

The Court finds no grounds to disturb the ALJ's finding that Sasona was qualified as a vocational expert. Sasona's credentials appear to satisfy the criteria identified in the Vocational Expert Handbook for the Philadelphia Region. Further, the Court agrees with the ALJ that the number of placements Sasona was involved in over the past five years does not render her unqualified as a vocational expert. Her testimony in the present case reveals her

qualifications and ability to testify regarding the existence of certain jobs in the national economy as necessary to assist the ALJ under step five. Therefore, the ALJ did not err in finding Sasona qualified as a vocational expert.

### 3. Sasona's Testimony Was in Accord with the ALJ's Hypothetical

Plaintiffs argue that Sasona's testimony was not in accord with the ALJ's hypothetical and conflicted with the Dictionary of Occupational Titles ("DOT"). (Pl. Br. at 20-21.) Plaintiffs contend that the ALJ's hypothetical indicated that the person has no feeling in the right index finger and is limited to goal-oriented rather than production-paced tasks. (Id.) Plaintiffs argue that the jobs of table worker and document preparer, identified by Sasona and defined in the DOT, could not be performed by someone with the hypothetical limitations. (Id. at 20-21.)

Defendant responds that Sasona specifically testified that an individual with no feeling in the right index finger would be able to perform the job of table worker and both jobs were not production-paced. (Gov't Opp. at 18.) Defendant contends that no conflict exists between Sasona's testimony and the DOT because Sasona was never questioned about which products were handled by a table worker. (Id. at 19.) Defendant argues that because Sasona was

qualified as a vocational expert, the ALJ was entitled to rely on her testimony. (Id. at 18.)

The position of table worker is described in the DOT as follows: "Examines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles." DOT § 739.687-182.

The position of document preparer is described in the DOT as follows:

> Prepares documents, such as brochures, pamphlets, and catalogs, for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices: Cuts documents into individual pages of standard microfilming size and format when allowed by margin space, using paper cutter or razor knife. Reproduces document pages as necessary to improve clarity or to reduce one or more pages into single page of standard microfilming size, using photocopying machine. Stamps standard symbols on pages or inserts instruction cards between pages of material to notify MICROFILM-CAMERA OPERATOR (business ser.) 976.682-022 of special handling, such as manual repositioning, during microfilming. Prepares cover sheet and document folder for material and index card for company files indicating information, such as firm name and address, product category, and index code, to identify material. Inserts material to be filmed in document folder and files folder for processing according to index code and filming priority schedule.

DOT § 249.587-018.

The Third Circuit has noted that "[a] hypothetical question posed to a vocational expert must reflect *all* of a claimant's impairments." Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002) (emphasis in original) (citation and internal quotations omitted). However, the ALJ is not required to "submit to the vocational expert

every impairment *alleged* by a claimant." <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original). Instead, "the hypotheticals posed must 'accurately portray' the claimant's impairments and that the expert must be given an opportunity to evaluate those impairments "as contained in the record." <u>Id.</u> As such, "the ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations."* <u>Id.</u> (emphasis in original).

The Third Circuit has also identified the appropriate procedure where there is a conflict between the vocational expert's testimony and the DOT. Where an unresolved conflict exists between the vocational expert's testimony and the DOT:

> [t]he adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

<u>Rutherford v. Barnhart</u>, 399 F.3d 546, 556 (3d Cir. 2005) (citing SSR 00-4P, 2000 WL 1898704 (S.S.A. Dec. 4, 2000)). SSA 00-04P is to be viewed in conjunction with the ALJ's broader obligation to develop the record sufficient to allow appellate review. <u>Id.</u> at 557. However, the failure of the ALJ to explain a conflict does not require reversal where the ALJ's step five analysis is otherwise supported by substantial evidence. <u>Jones v. Barnhart</u>, 364 F.3d 501, 506 (3d

Cir. 2004) (finding that inconsistencies between vocational expert testimony and DOT "did not cause an ALJ determination at step 5 to be devoid of substantial evidence" where such inconsistencies did not exist as to *all* of the jobs identified by the vocational expert).

In this case, Plaintiffs do not argue that the ALJ's hypothetical failed to include all of Lippincott's impairments. Instead, Plaintiffs argue that the jobs identified by Sasona do not conform to the ALJ's hypothetical, and Sasona's testimony regarding these jobs conflicts with the DOT. Specifically, Plaintiffs argue that the jobs of table worker and document preparer are production-paced and neither could be performed by a person without the full use of both hands. (Pl. Br. at 21.)

First, the record makes clear that the ALJ followed the appropriate procedure to address any possible conflict with the DOT. The ALJ complied with SSR 00-4P by asking Sasona if, and to what extent, her testimony departs from the DOT. (R. at 66.) Sasona responded only that the job of document preparer is different in so far as it now involves different technology, i.e., scanned documents as opposed to microfilm. (Id.) Sasona did not identify any further conflicts for either job. The ALJ's decision states, "Pursuant to SSR 00-4P, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (R. at 29.)

Second, Sasona's responses to questions from Lippincott's counsel on cross-examination show that her testimony regarding the job of table worker conforms to the ALJ's hypothetical and does not conflict with the DOT. In particular, Sasona explained that the job of table worker could be performed by someone without sensation in their right index finger because that person would have sensation in their other fingers. (R. at 67.) She also explained that the job of table worker is not a production-paced task. Sasona testified that it is paced only in the sense that items would be moving on a conveyor belt and the individual would have an opportunity to inspect the items before they pass. (R. at 75-76.) Further, Sasona was never asked by the ALJ or Lippincott's counsel whether the job of table worker was limited to a specific product. Having confirmed that an individual with the hypothetical limitations could perform the job, she had no reason to specifically identify the products involved. The Court finds nothing in Sasona's testimony that conflicts with the DOT description of table worker. Therefore, Sasona's testimony regarding the job of table worker neither failed to accord with the ALJ's hypothetical, nor conflicted with the DOT.

Because the ALJ need only identify a single job within the claimant's capacity that exists in significant numbers in the national economy, the Court need not consider whether the ALJ failed to address a conflict between Sasona's testimony regarding the job of document

53

preparer and the DOT.  20 C.F.R. §§ 404.1566(b) ("Work exists in the national economy when there is a significant number of jobs (*in one or more occupations*)" (emphasis added)); 416.966(b)(same); <u>Thornton v. Astrue</u>, CIV.A. 12-2524, 2013 WL 460138, at *7 (E.D. Pa. Feb. 7, 2013) (finding no need decide whether the ALJ committed error with respect to one job where second job identified by vocational expert was supported by substantial evidence).  Because the ALJ appropriately credited Sasona's testimony regarding the job of table worker, the Court finds that substantial evidence supports the ALJ's determination at step five.

### D.  Letter Brief from Lippincott's Counsel

Plaintiffs argue that the ALJ failed to consider counsel's letter brief submitted shortly after the last hearing on April 15, 2011, but before the ALJ's decision on June 3, 2011.[12]  (Pl. Br. at 21.)  Counsel's letter brief requested a supplemental hearing with the vocational expert or interrogatories directed at the vocational expert to address alleged ambiguity in the vocational expert's testimony regarding the job of table worker.  (R. at 399-403.)  Counsel noted that Sasona referred to a specific table worker position involving linoleum material, while the DOT contains several

---

[12] Lippincott's counsel's letter brief is dated April 25, 2011.  (R. at 399.)

other entries for table workers in other industries with requirements not conforming to the ALJ's hypothetical.  (Id.)

Defendant responds that the ALJ's decision reveals that he did consider Plaintiffs' arguments.  (Gov't Opp. at 20.)  Specifically, Defendant notes the ALJ's discussion of Lippincott's prison records as evidence that he considered counsel's letter brief.  (Id.)

The ALJ "may . . . reopen the hearing at any time before he or she mails a notice of the decision in order to receive new and material evidence."  20 C.F.R. § 404.944; 20 C.F.R. § 416.1444.  However, administrative hearings are subject to requirements of due process.  Gauthney v. Shalala, 890 F. Supp. 401, 408 (E.D. Pa. 1995) (Richardson v. Perales, 402 U.S. 389, 401-02 (1971)).  "[W]hen an administrative law judge chooses to go outside the testimony adduced at the hearing in making a determination on a social security claim, the ALJ must afford the claimant not only an opportunity to comment and present evidence but also an opportunity to cross-examine the authors of any post-hearing reports when such cross-examination is necessary to the full presentation of the case, and must reopen the hearing for that purpose if requested."  Wallace v. Bowen, 869 F.2d 187, 193 (3d Cir. 1989).

The instant case is distinguishable from cases where the ALJ relies on post-hearing evidence without satisfying due process.  Here, the ALJ did not rely on post-hearing evidence in rendering his

decision.  Instead, counsel's letter brief alleged ambiguity in Sasona's testimony and requested an opportunity to clarify that ambiguity at a supplemental hearing or through interrogatories. Specifically, counsel argued that the DOT contains many listings for the job of table worker that do not conform to the ALJ's hypothetical and Sasona only testified regarding one table worker position. While the ALJ did not grant counsel's request for a supplemental hearing or interrogatories directed at Sasona, the Court does not find an abuse of discretion in denying these requests.  Further, the fact that the ALJ's decision fails to specifically address counsel's arguments raised for the first time in the post-hearing letter brief does not affect this Court's conclusion that the ALJ's findings at step five are supported by substantial evidence.  Sasona's testimony is clear that she was referring to a specific table worker position extant in significant numbers in the national economy.  Counsel's post-hearing argument that the DOT contains other table worker positions not conforming to the ALJ's hypothetical does not warrant further explanation by the ALJ because Sasona did not testify regarding these positions.  Moreover, Plaintiffs fail to cite any authority requiring the ALJ to fully respond to arguments raised for the first time in a post-hearing letter brief.  Therefore, the Court finds that the ALJ acted within his discretion in his treatment of counsel's letter brief.

## V. Conclusion

For the foregoing reasons, the Court finds that substantial evidence in the record supports the ALJ's determination that Lippincott failed to satisfy the requirements of Listing 12.04. However, the ALJ's conclusions under Listings 1.04 and 11.00 do not allow judicial review. Therefore, the Court will vacate the Commissioner's final decision and remand the matter to allow the ALJ to develop his reasoning and analysis as to Lippincott's impairments under Listings 11.00 and 1.04 at step three. An accompanying Order will be entered.


**November 8, 2013**            **s/ Jerome B. Simandle**
Date                                             JEROME B. SIMANDLE
                                                      Chief U.S. District Judge